**In re The Matter of PUBLIC LAW NO. 154–1990 (H.E.A. 1044).**

No. 49S00–9006–OR–388.

Supreme Court of Indiana.

Nov. 2, 1990.

Gary P. Price, Lewis Kappes Fuller & Eads, Indianapolis, for petitioner Ted B. Lewis.

Edward O. DeLaney, Barnes & Thornburg, Indianapolis, for intervening petitioners Legal Services Organization of Indiana, Inc., Legal Services of Maumee Valley, Inc., Legal Services Program of Northern Indiana, Inc., and Legal Services Program of Northwest Indiana, Inc.

William F. Harvey, Arthur H. Northrup, Indianapolis, Theodore L. Sendak, Crown Point, Robert S. Koor, Muncie, for respondents.

DICKSON, Justice.

This case requires us to determine whether a particular legislative enactment is valid notwithstanding a provision in the Constitution of Indiana that assigns to the judicial branch a subject matter central to the enactment.

The 106th General Assembly of the State of Indiana enacted Sections 15 through 24 of Public Law No. 154–1990 (House Enrolled Act No. 1044), Ind.Code §§ 33–20–1–1 through 33–20–9–2, entitled "Interest–Bearing Attorney Trust Accounts" (hereinafter referred to as the Attorney Trust Account Act). The Act establishes a system by which interest on certain client funds held in attorneys' trust accounts may be directed to a "Trust Account Board" to create a trust account fund to be used for the expressed purpose of enhancing the delivery of civil legal assistance to Indiana clients eligible for legal aid, and to be used for other specified purposes.

Petitioner Ted B. Lewis, on behalf of himself and other attorneys, brought this action for declaratory relief as an original action in this Court. He seeks a writ declaring, among other things, that an included "immunity clause," Ind.Code § 33–20–2–1, shielding attorneys from disciplinary action for participation in the statutory attorney trust account program, does

not contravene Article 3, Section 1, of the Constitution of Indiana.

In view of the unique circumstances which give rise to this case, this Court has recognized an unconventional procedural process for its resolution. By separate order entered June 20, 1990, we ordered the establishment of the Indiana Attorney Trust Account Fund held in abeyance, and invited any interested attorney to file a response in opposition to the petition for declaratory relief. Deadlines for such submissions were established and have now expired, with several responses having been submitted. As to the question of constitutionality of the "immunity clause," the petitioners and several responding attorneys have filed memoranda in support of their respective positions. One such responding attorney has filed an alternative motion seeking, in part, a judgment on the pleadings. Because the constitutionality of the "immunity clause" is solely a question of law, the presentation of factual evidence is not necessary. We therefore deem this issue closed and ripe for adjudication.

We begin our review by noting that every statute stands before this Court cloaked with a presumption of constitutionality. *B & M Coal Corp. v. United Mine Workers* (1986), Ind., 501 N.E.2d 401; *American National Bank and Trust Co. v. Indiana Dep't. of Highways* (1982), Ind., 439 N.E.2d 1129. It is our duty to bring it into harmony with constitutional requirements, if the language permits. If it is capable of any constitutional interpretation, it must be upheld. *Progressive Improvement Ass'n v. Catch All Corp.* (1970), 254 Ind. 121, 258 N.E.2d 403. As we observed in *Johnson v. St. Vincent Hospital, Inc.* (1980), 273 Ind. 374, 382, 404 N.E.2d 585, 591:

A statute is not unconstitutional simply because the court might consider it born of unwise, undesirable, or ineffectual policies.

The petitioner designates Ind.Code § 33–20–2–1 as the "immunity clause" of the Attorney Trust Account Act. The clause provides:

An attorney is not subject to disciplinary action as a result of any action taken in accordance with this article.

A related provision, Ind.Code § 33–20–5–8, states:

An attorney:

(1) does not breach a fiduciary duty;

(2) is not liable in damages; and

(3) *is not subject to disciplinary* action; because of a deposit of money in an interest-bearing attorney trust account if the attorney acted in accordance with a good faith judgment that the money constituted qualified funds. [Emphasis added.]

There are two provisions of the Constitution of Indiana pertinent to our discussion. Article 3, Section 1 provides:

The powers of the Government are divided into three separate departments; the Legislative, the Executive including the Administrative, and the Judicial; and *no person, charged with official duties under one of these departments, shall exercise any of the functions of another*, except as in this Constitution expressly provided. [Emphasis added.]

Article 7, Section 4, provides in part:

The Supreme Court shall have no original jurisdiction *except in admission to the practice of law; discipline or disbarment of those admitted;* the unauthorized practice of law; discipline, removal and retirement of justices and judges; supervision of the exercise of jurisdiction by the other courts of the State; and issuance of writs necessary or appropriate in aid of its jurisdiction. [Emphasis added.]

The scope of the judicial department's functions under Section 4 was enunciated in *Matter of Mann* (1979), 270 Ind. 358, 361, 385 N.E.2d 1139, 1141:

It is the exclusive province of this Court to regulate professional legal activity.

In *Mann* we held that a legislative grant of immunity under Ind.Code § 35–6–3–1 (immunity from incriminating testimony given pursuant to court order) does not extend to attorney disciplinary proceedings because "to hold otherwise would suggest an un-

constitutional invasion into this Court's constitutional authority." *Id.*

■ The petitioner contends that the statute and its included attorney discipline immunity provisions constitute matters merely "incident of the practice of law," or matters of procedure legislatively appended to the substance of the practice of law. The intervening petitioners argue that these provisions do not involve the taking of client funds but apply to a new form of property created by the legislature and thus are a permissible regulation of the commercial aspect of the practice of law. We do not agree. By declaring an absolute immunity from the disciplinary rules and procedures adopted by the judicial department, the Attorney Trust Account Act clearly oversteps the boundary set by Article 3, Section 1, of the Constitution of Indiana.

That this boundary may have concerned the drafters of the Act appears likely from the inclusion of Ind.Code § 33–20–2–2:

This article does not apply to an activity that is:

(1) the practice of law; and

(2) regulated by the judicial department of state government.

Regardless of the reasons for its inclusion, the effect of this provision would be to declare that the duties and obligations with respect to client funds held by an attorney are matters outside the practice of law and not subject to regulation by this Court. This result is contrary to both existing standards and past enforcement.

The obligations of an attorney for the safekeeping of property of others are prescribed in Rule 1.15 of the Indiana Rules of Professional Conduct adopted by this Court. The commingling of clients' funds by lawyers has been the source of the greatest number of disciplinary proceedings brought in this state. *Matter of Indiana State Bar* (1990), Ind., 550 N.E.2d 311, 312. The improper use of entrusted client funds to generate interest without remittance to the client has even been specifically addressed. This Court imposed sanctions upon an attorney who retained interest income earned from client funds in

*Matter of Kesler* (1979), 272 Ind. 161, 397 N.E.2d 574, *cert. denied* (1980), 449 U.S. 829, 101 S.Ct. 96, 66 L.Ed.2d 34.

The immunity provisions of the Attorney Trust Account Act clearly and literally attempt to exercise by limitation the attorney disciplinary function of the judicial department. Notwithstanding the presumption of constitutionality and our duty to harmonize the Attorney Trust Account Act with constitutional requirements if possible, we are unable to view the attorney immunity provisions of the act as compatible with Article 3, Section 1, of the Constitution of Indiana.

■ The remaining question is whether this constitutional infirmity applies only to the immunity provisions or to the entire Act. The test for severability expressed in *Dorchy v. Kansas* (1924), 264 U.S. 286, 289–90, 44 S.Ct. 323, 324, 68 L.Ed. 686, 689–90, was quoted with approval in *In re City of Mishawaka* (1972), 259 Ind. 530, 533, 289 N.E.2d 510, 512:

A statute bad in part is not necessarily void in its entirety. Provisions within the legislative power may stand if separable from the bad.... But a provision, inherently unobjectionable, cannot be deemed separable unless it appears both that, standing alone, legal effect can be given to it and that the legislature intended the provisions to stand, in case others included in the act and held bad should fall.

In determining legislative intent, we consider whether or not the legislature would have passed the statute had it been presented without the invalid features. *Id.*

Apart from the attorney discipline immunity provisions, the Attorney Trust Account Act establishes a fund to receive proceeds from interest generated from attorney trust accounts and a board to establish procedures and oversee the utilization of fund. It is clear that, without the Act's immunity from discipline, the present rules and precedent of this Court prohibit Indiana attorneys from participation in a program whereby interest earned on their clients' funds is redirected for other pur-

poses without the clients' consent. Thus, without the immunity clause, the remaining provisions of the Act can have no practical legal effect. The legislature cannot be presumed to have intended the balance of the Act to stand absent attorney participation. The statutory immunity is central and critical to the entire Attorney Trust Account Act and cannot be severed from the rest of the statute.

We therefore determine, declare, and adjudge that Public Law 154–1990, §§ 15–23, Ind.Code §§ 33–20–1–1 through 33–20–9–2, entitled "Interest–Bearing Attorney Trust Accounts," is void in its entirety by reason of its contravention of Article 3, Section 1, of the Constitution of Indiana.

With this decision, however, we do not foreclose the possibility of future consideration by this Court of new factual matters supporting review of our prior disapproval of programs permitting charitable utilization of interest on lawyer trust accounts. *Indiana State Bar*, 550 N.E.2d 311. Our holding requires only that matters related to attorney discipline, including the adoption and enforcement of applicable rules of professional conduct, are the exclusive function of the judicial department.

GIVAN, J., concurs.

PIVARNIK, J., concurs, and files separate opinion in which GIVAN, J., joins.

SHEPARD, C.J., concurs and dissents, and files separate opinion.

DeBRULER, J., concurs and dissents, and files separate opinion.

PIVARNIK, Justice, concurring.

I concur in this opinion. A very important and meaningful structure of our government is its composition of three branches of separate but equal powers, each having its own area of assigned duties and responsibilities. It is imperative that each of those branches attend to its assigned responsibilities in a vigilant manner to insure that society is served and protected in the way it expects to be, not for the purpose of "protecting turf" but so that branch might act properly and responsibly. Clearly the constitution of Indiana gives exclusive province of this Court to the regulation of professional legal activity. The judicial branch of our government is composed of, managed by, and regulated exclusively by members of the legal profession —lawyers. Therefore, we have the very sensitive responsibility of managing and policing ourselves as members of an honorable profession at the same time acting in behalf of all of the citizens as trustees of the third branch of government. To give members of our profession a blank check of immunity from discipline as well as civil and criminal liability in the handling of large amounts of money coming from the funds of our clients, as provided in Ind. Code § 33–20–2–1, would be to abdicate from this sensitive responsibility and authority placed in our trust and be nothing less than irresponsible. It would be equally irresponsible to either sanction such action by the legislature or to undertake to so provide by our own order.

Indeed, the very serious problems with this entire proposed project is that by its very structure lawyers taking part in it will cause interest money accruing to funds of their clients to go to others over whom they have no control. That is, once the money is placed in the lawyer's trust account that lawyer has no knowledge, authority, or control over the use of that money. The bank is obliged to transfer the funds to the board or commission provided for and all discretion and authority as to its disbursement is in the hands of that board or commission. Though there are guidelines provided for in the statute for the use of these funds, such guidelines are very general, giving wide discretion for the most part and containing troubling provisions in its more specific parts. For example, sections 9 and 14 of the Act provide for the disbursement of money from the fund as follows: after July 1, 1993, up to fifteen percent (15%) toward "administrative costs" (including payments to board members and employees); ninety percent (90%) of the remaining funds to provide "legal assistance" to "eligible clients" and the remaining ten percent (10%) to "programs

or projects in the public interest that assist in the improvement of the administration of justice," including guardian *ad litem* and court appointed special advocate programs as well as lawyer referral services in "fee generating" cases.

There is no limitation as to the amount of money which can be spent on "administrative costs" prior to July 1, 1993. Thereafter, a cap of fifteen percent (15%) is imposed. Ninety percent (90%) of the remaining funds (76.5% of the total, assuming 15% goes toward administrative costs) is then available to provide "legal assistance" to "eligible clients." I now turn to this lawyer referral provision of the Act.

Lawyer referral services in Indiana which qualify for IOLTA funds must provide:

(i) a referral to an attorney in private practice without a charge for the referral; and

(ii) an initial consultation with an attorney in private practice without a charge for the consultation;

in a fee-generating case.

IC 33–20–7–9(2)(B)(i) and (ii). The Act itself provides that up to ten percent (10%) of the IOLTA funds (after payment of administrative expenses) can go to Indiana lawyer referral services. Under this provision, funds go to lawyers in private practice, not lawyers in legal aid clinics. Indeed, these funds are used to finance lawyer referral services which do nothing more than generate business for lawyers in private practice. If the goal of IOLTA programs is to promote *pro bono* activities among members of the bar, why does the Act provide for funds to be used to pay for referrals and initial consultation fees to lawyers in private practice?

Under the Act, the board would be authorized to disburse the funds by transferring them to other groups and organizations to be used at the discretion of the organization whose management and control is out of the hands of the board following such transfer. The very manner in which the board would function indicates that this is what would take place. Statistics tend to show that the boards in other jurisdictions

in this country have transferred funds for these purposes to legal services organizations within their states. One of these organizations is Legal Services Corporation, a federally funded legal service organization. Four units of Legal Services Corporation in Indiana received a combined total of over five million dollars ($5,000,-000) from the federal government in 1989. Legal Services Corporation, *Fact Book: 1988–1989* 172–73, 270. There is evidence that federally funded legal aid organizations have used grant money for various political activities in the past. Those wishing more enlightenment on the subject are referred to REPORT BY THE COMPTROLLER GENERAL OF THE UNITED STATES, B–202116, addressed to the Honorable F. James Sensenbrenner, Jr., House of Representatives (May 1, 1981), *reported in Hearings on Oversight of Certain Activities of the Legal Services Corporation, Focusing on Policies at the Corporation and Political Activities, Before the Senate Comm. on Labor and Human Resources,* 98th Cong., 1st Sess. (July 12 and 15, 1983) at 22–33 (*see also* pp. 100–05 and 323–25); REPORT BY THE COMPTROLLER GENERAL OF THE UNITED STATES, B–210338/B–202116, addressed to the Honorable Orrin G. Hatch, Chairman of the Senate Committee on Labor and Human Resources (September 19, 1983), *reported in Hearing on Review of the Corporation's Documents to Ascertain Whether There Are Any Problems with the Agency's Policies that Need To Be Addressed, Before the Senate Comm. on Labor and Human Resources,* 98th Cong., 2nd Sess. (April 11, 1984) at 4–19. *See also* 55 Fed.Reg. 5664–66 (February 16, 1990) (United States Department of Health and Human Services Poverty Guidelines). No inference is made here that any Indiana organization uses any of its funds for political activity. I have no knowledge of whether they do or not. Furthermore, there are other legal service units in Indiana that are independent, receive no federal funds, and do a creditable and outstanding job of delivering services to those in need which would be considered qualified under the Act. The point is, we do not know what organizations will receive these

funds and how and in what manner they will use them. We do not know what amounts will finally reach the goal of supplying legal services to the poor and needy.

It is appropriate that our profession be concerned with delivery of legal services to those in need and yet not able to afford them. This can be accomplished by *pro bono* services delivered by lawyers in the giving of time, service and resources. The proposed project requires no lawyer to lift a hand nor spend a penny. Each lawyer merely places his clients' money in a trust account and, through processes already described at length, the interest generated goes to pay lawyers for their services. We can do better than this.

GIVAN, J., concurs.

SHEPARD, Chief Justice, concurring and dissenting.

In enacting the Attorney Trust Account Act, commonly called "IOLTA," the Indiana General Assembly found that existing legal programs for the poor "do not adequately meet the needs of indigent persons." It also declared that using funds generated by interest-bearing attorney trust accounts to provide legal assistance to the poor "is in the public interest" and "is a proper use of the funds." Ind.Code § 33–20–1–1 (West 1990 Legis. Serv.).

The legislature chose to act on these findings by creating an Indiana Lawyer Trust Account Fund, to which lawyers would transmit the interest collected on small amounts being held in trust accounts for short periods. The amounts at issue are so small that the cost of individual accounting and payment exceeds the amount of interest that might be earned. The relatively recent availability of demand deposit accounts that pay interest has made IOLTA possible.

The General Assembly, representing as it does the democratic voice of the five and a half million Hoosiers to whom this Court is also responsible, is the principle enunciator of public policy for our state. Still, its declaration about the appropriate policy for Indiana does not stand alone. The voices of our fellow Indiana lawyers are virtually unanimous in the conclusion that an IOLTA program would be both ethical and salutary for Indiana. The associations of our profession have added their voice: the Indiana State Bar Association, the Indiana Bar Foundation, the Indianapolis Bar Association, the Clark and Floyd County Bar Associations, and the Allen County Bar Association, to name a few, have all petitioned this Court to permit IOLTA to go forward. The deans of our four law schools have also been consistent supporters.

Thinking that there might be in the profession some "great silent majority" truly opposed but cowed into submission, this Court published an opinion denouncing IOLTA, *Matter of Indiana State Bar* (1990), Ind., 550 N.E.2d 311 (4–1, Shepard, C.J., dissenting), and issued two calls for lawyers who might be opposed to IOLTA to respond to this litigation. The resulting letters in opposition can be counted on one hand. In the face of this degree of unanimity, a decent respect for the opinions of mankind (Mr. Jefferson's phrase) ought to suggest a different course of action than the one adopted today by the Court.

I cannot disagree with the legal analysis of my brother Dickson about the distribution of powers in Article 3 of the Indiana Constitution. It commands each branch of the government not to intrude on the duties assigned to the other branches. Article 7 of the Constitution plainly assigns to the judicial branch the responsibility for regulating the practice of law in the state. This is a constitutional duty which the Court has usually defended strongly.

Still, there are times when the better part of valor is to assent to the opinions of others and accept an action taken by another branch even if that action goes beyond its assigned duties. If legislators, judges, and governors insisted on defending their prerogatives at every turn, government would be a continuing series of turf wars rather than an enterprise for the public good.

I believe the Court should assent to the policy determination made by the legislature and the governor and adopt as its own

through rule an IOLTA program for Indiana. In the other forty-nine states with such programs more than $160 million has been generated for law-related education, pro bono programs, legal services for the poor, scholarships, and research about the legal system. The people of Indiana would benefit greatly from improvements in these activities. I look forward to the day when this Court may make it possible.

DeBRULER, Justice, concurring and dissenting.

Those serving in the legislative and executive branches of the state government are, like those serving in the judicial branch, bound to construe, to uphold, and to enforce the provisions of the Indiana Constitution to the best of their abilities. I agree with the majority wherein it concludes that the reading given Article 3, § 1 in conjunction with Article 7, § 4, fell short when this Act was brought into being. Because of the substantial nature of the underlying value judgments that the public at large and the profession as well would benefit from this program, however, I would not judge the act void, as the majority does, but for the time being would permit it to stand under the aegis of this Court and turn to the business of determining the basic issue, namely, whether this program is at odds with the primary duty of lawyers to safekeep and promptly remit money belonging to clients. Ind. Professional Conduct Rule 1.15.

In fulfilling the above-cited basic fiduciary responsibility to clients, lawyers are, by necessity, relegated to the use of products made available by banks. This Act, as I see it, encourages banks to offer a new product, namely, interest-bearing attorney trust accounts. I would accept the invitation of the supporters of this Act to provide a basis via expert witnesses for comparing the administration of this new product by depository financial institutions, with the administration of other available accounts presently in use by lawyers to collect, hold, and disburse clients' money, which may, in the view of the supporters, appear to satisfy professional standards.