**In the Matter of Kenneth C. KERN.**

**No. 49S00–8806–DI–547.**

Supreme Court of Indiana.

June 21, 1990.

Kenneth Kern, Indianapolis, Mark Lane, Washington, D.C., for respondent.

Sheldon A. Breskow, Executive Secretary, Indianapolis, for Ind. Supreme Court Disciplinary Com'n.

PER CURIAM.

This case is before the Court on a two count complaint charging the Respondent, Kenneth C. Kern, with violating the *Code of Professional Responsibility* and the *Rules of Professional Conduct for Attorneys at Law* which superseded the *Code* effective January 1, 1987. The Hearing Officer appointed pursuant to Admission and Discipline Rule 23 has submitted her findings concluding that the Respondent engaged in misconduct under Count II but finding insufficient evidence to prove misconduct under Count I. The Respondent has petitioned for review of the findings, and the Commission has responded. The Respondent has also filed a Motion to Strike the Disciplinary Commission's Brief and a Request for Sanctions wherein he contends that the charges are frivolous and unfounded and that costs of this proceeding should be assessed against the Commission.

The review process employed in disciplinary cases involves a *de novo* examination of all matters presented to the Court. *In re Hampton* (1989), Ind., 533 N.E.2d 122. This includes a review not only of the Hearing Officer's report but also of the entire record tendered in the case. The Hearing Officer's findings receive emphasis due to the unique opportunity for direct observation of witnesses, but this Court reserves the right to make the ultimate determination. *In re Stanton* (1986), Ind., 492 N.E.2d 1056. Respondent's objections to the findings and conclusions will be resolved within the context of this review process. Respondent's Motion to Strike is hereby denied.

Upon review of all matters submitted before us, this Court finds that the Respondent was admitted to the Bar of this State in 1965 and is, thus, subject to this Court's disciplinary jurisdiction. The Respondent represented Dr. Lon Kaminsky, a Tippecanoe County chiropractor, in various criminal, civil and licensing board charges and complaints filed by the Tippecanoe County Prosecutor and the Indiana State Attorney General. The Respondent also served as counsel for Kaminsky *et al.* in a civil suit in the United States District Court, Southern District of Indiana, filed against attorneys from the above described offices and others associated with the charges and complaints.

The federal law suit was the result of Kaminsky's and the Respondent's belief that a conspiracy existed between those offices and the American Medical Association in an attempt to stop Kaminsky's chiropractic practice specifically and to interfere with the chiropractic practice in this

state in general. The Hearing Officer also found that there had developed a "get" Kern mentality at the Attorney General's Office and the Tippecanoe County Prosecutor's Office because of Respondent's style and his representing Kaminsky in the federal law suit.

█ Count I of the complaint charges that, by conspiring with a third party to defraud the Office of the Attorney General and to illegally obtain confidential information, much of which was comprised of attorney work product, the Respondent circumvented a disciplinary rule through the actions of another; engaged in illegal conduct involving moral turpitude; engaged in conduct involving dishonesty, fraud, deceit and misrepresentation; engaged in conduct that is prejudicial to the administration of justice; and engaged in conduct that adversely reflects on his fitness to practice law, all in violation of Disciplinary Rules 1–102(A)(2), (3), (4), (5) and (6) and 7–102(A)(8) of the *Code of Professional Responsibility for Attorneys at Law.*

Relative to this count, we find that, in the summer of 1986, Respondent's client, Kaminsky, hired Peter Lisa as investigator. Lisa worked out of the Washington D.C. area for Excalibur Research, Inc., and had been interested in the subject of organized medicine's opposition to chiropractic and other alternative health services.

Kaminsky met with Lisa at Respondent's office often and, at times, with the Respondent present. Lisa was paid through Respondent's office out of an escrow account in the name of Kaminsky. Payments were authorized by Kaminsky, and the checks were signed either by Respondent or his office manager. The money in Kaminsky's escrow account which was used to pay for Lisa's services was deposited by Kaminsky's benefactors and did not come from Kaminsky.

Lisa visited the Office of the Attorney General and the Tippecanoe Prosecuting Attorney's Office and eventually was able to review their internal files pertaining to Kaminsky and to obtain copies of requested information.

Lisa indicated that he was investigating quackery and health care fraud and cited a number of names of persons in government, including the name of Congressman Claude Pepper, but was both vague and confusing as to the exact connection. Just prior to Lisa's appearance, the Attorney General's Office had received a questionnaire from Congressman Pepper's office, and it was assumed that Lisa had some official role with Pepper or Pepper's committee. The second day at the Attorney General's office, Lisa ·was introduced as having been sent from Pepper's office. Lisa did nothing to correct this misconception and in fact accepted and placed in his briefcase the questionnaire which the Attorney General's Office had received from Congressman Pepper's office and desired to return to the Congressman.

A similar scenario took place at the Tippecanoe Prosecutor's Office where Lisa confirmed that he was being helped in his investigation by the Attorney General's Office and was accepted as working for Congressman Pepper. Thus, he obtained access to records and documents he would never have seen had his true identity been known. The Hearing Officer found that Lisa was able to obtain access to files and records in these offices also because of their failure to require credentials and verification of his status.

Under this guise, Lisa, who was at this time working for Kaminsky, accompanied a deputy prosecuting attorney to a pretrial hearing in the criminal case against Kaminsky. Neither Kaminsky, the Respondent who represented him, nor Lisa acknowledged one another on that occasion.

Thereafter, Lisa returned to the Attorney General's Office, but by this time, both the Attorney General's office and the Tippecanoe County Prosecutor's Office were suspicious of Lisa, and, when he was introduced as someone from Pepper's office, Lisa stated that he was with Congressman Andrew Jacob's office. Lisa was later arrested but he was released because charges were not filed within 72 hours.

Lisa was in the Respondent's office on various occasions during 1986 to copy doc-

uments on Respondent's copy machine, including documents obtained from the Attorney General's Office and from the Tippecanoe County Prosecutor's Office, to meet with the Respondent and Kaminsky and to pick up checks drawn for him.

Lisa gave some of the materials so obtained to Kaminsky who turned them over to Respondent for his use in answers and discovery conducted in the various Kaminsky cases. Lisa also delivered the documents he had obtained from the Attorney General's Office to the office of Congressman Jacobs with a cover letter indicating that he had collected the documents for attorney Kern. Lisa later explained that he did so because he felt Kern's name would carry greater weight.

The Hearing Officer found that Respondent did not direct Lisa's activities but knew or should have known that, when dealing with the Tippecanoe Prosecutor's Office and the State Attorney General, Lisa was not going to announce himself as working on behalf of Kaminsky.

The Hearing Officer concluded that there is insufficient factual basis to hold the Respondent responsible for Lisa's conduct and to find misconduct. The Disciplinary Commission has not challenged this conclusion. Nonetheless, as set out previously in this opinion, the review process applicable to attorney disciplinary cases reserves for this Court the right to make the ultimate determination based upon a *de novo* review of all submitted matters.

Upon such review, we conclude that the evidence is insufficient to prove that the Respondent, by conspiring with Lisa to defraud, engaged in illegal conduct involving moral turpitude or conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of Disciplinary Rules 1–102(A)(3) and (4). However, the extent of Respondent's contact with Lisa, Respondent's subsequent use of documents obtained by Lisa, Respondent's awareness of the prosecutorial and adversary nature of the relationship between the offices and Respondent's client, Respondent's collusion with the apparent deception perpetrated by Lisa on the Tippecanoe Deputy Prosecutor

indicates that the Respondent had more than ample information to be on notice that Lisa had obtained information from opposing counsel by other than honest means. See *In re Hampton* (1989), Ind., 533 N.E.2d 122, 126; *In re Morelein* (1988), Ind., 520 N.E.2d 1275, 1277. Such conduct frustrates the orderly administration of justice and reflects negatively on the legal profession. On the other hand, the Hearing Officer's assessment of this and all other evidence and her judgment in reconciling conflicting testimony carries great weight. We give deference to her judgment and conclude, as she did, that the foregoing findings do not form a sufficient basis for finding misconduct under the remaining allegations of this count.

Under Count II, the Respondent is charged with violating Rules 1.7(b) and 3.7 of the *Rules of Professional Conduct for Attorneys at Law.*

In May of 1987, the Marion County Grand Jury issued target subpoenas to Respondent and Lisa as result of Lisa's activities on behalf of Kaminsky and the Respondent. In July of 1987, Scott Newman, the Marion County Deputy Prosecutor handling the Lisa case, withdrew the target subpoena against the Respondent. On August 19, 1987, Lisa was indicted on three charges, Impersonating a Public Servant, Criminal Conversion and Theft.

During the Grand Jury proceedings, Lisa was represented by a Florida attorney, Benny Lazzara. After the indictment, the firm of Tabbert and Ford represented Lisa. The Respondent did not enter his appearance in Lisa's criminal case until October 13, 1987.

On November 9, 1987, Scott Newman gave notice to Respondent that the Respondent would be a state's witness against Lisa and filed a motion to disqualify the Respondent as attorney for Lisa. The Respondent also filed a motion to disqualify Newman, and the trial court denied both motions on December 4, 1987. On January 6, 1988, Deputy Prosecutor Newman sent the Respondent a letter wherein the State offered a plea bargain to Lisa with a suspended sentence on one count and dismissal

of two other counts if Lisa would testify as to the involvement of the Respondent and others. Later Newman offered possible full immunity for such testimony if Lisa would testify as to Respondent's involvement and any others. The offer was refused. This same offer had been communicated first to Lisa's Florida attorney and later to Tabbert and Ford and also refused. The state filed a second motion to disqualify the Respondent but this motion too was denied. On February 9, 1988, the Respondent was released as witness in the case against Lisa.

On the morning of his scheduled jury trial, March 7, 1988, Lisa pled guilty to the charge of Impersonating a Public Servant pursuant to a plea agreement. This followed an *in camera* exchange between counsel and the judge at which the attorneys were told that the case should be settled and that if Lisa were found guilty at trial the judge was willing to make a "martyr" out of him. Lisa was sentenced to one year, suspended, and fined $500 plus costs. At Newman's request, the trial judge took evidence on the record that Lisa consented to Respondent's representation.

The Hearing Officer found that Respondent's own interests in the conduct and outcome of the Lisa case were both real and evident from the time the Grand Jury investigation began and throughout the proceedings of the criminal case against Lisa.

Although the Respondent concedes that the offer of immunity for his client in exchange for testimony against the Respondent was communicated to the Respondent, he denies any conflict of interest in his continued representation of Lisa under such circumstances. Respondent argues that he presented a vigorous defense on behalf of Lisa and communicated all offers from the Marion County Prosecutor's office. He claims further that because he and Lisa knew that he had not directed Lisa's activities, he could have no direct interest in Lisa's case and, thus, no conflict with Lisa's interests. It is his contention that Deputy Prosecutor Newman initiated the investigation against him because Newman was interested in creating a collateral defense to the civil action filed by the Respondent on behalf of Kaminsky against the Attorney General's Deputies involved in this case.

Respondent's argument is not persuasive. From the time of the Grand Jury investigation and throughout the proceedings of the Lisa prosecution the Respondent was aware that he was a primary focus of the investigation and that Lisa could walk away from the criminal proceeding if he would implicate the Respondent. Regardless of his own understanding and belief as to whether or not the prosecution's position and actions in this matter were well founded, it is clear that Respondent's own interests were in direct conflict with the interests of his client. Lisa had an opportunity to benefit from providing information against the Respondent and was entitled to an objective analysis and advice on the issue. Respondent's own subjective interpretation of the incident and his determination that conflict did not exist only indicates further his distorted perception of what was at stake.

The Respondent further contends that if conflict did in fact exist, it was waived by Lisa. Rule 1.7(b) of the *Rules of Professional Conduct* prohibits a lawyer from representing a client if the representation of that client may be materially limited by the lawyer's own interests unless (1) the lawyer reasonably believes that representation of that client will not be adversely affected; and (2) the client consents after consultation. The Comment following Rule 1.7 provides added insight as to consultation and consent in such conflict situations. It states that when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot provide representation on the basis of the client's consent. No disinterested lawyer could ethically conclude that Lisa should be represented by the very person against whom the Prosecution was seeking information in exchange for Lisa's immunity. Respondent's belief that his continued representation of Lisa under these circumstances would not be affected by Respon-

dent's own interests is patently unreasonable.

The Respondent also points out that the trial court denied the Prosecution's attempts to disqualify Respondent as counsel. The discipline of a member of the Bar of this State is independently determined from any other proceeding. *In re McDaniel* 1984, Ind., 470 N.E.2d 1327. *In re Mann* (1979), 270 Ind. 358, 385 N.E.2d 1139, *In re Crumpacker* (1978), 269 Ind. 630, 383 N.E.2d 36, cert. denied 444 U.S. 979, 100 S.Ct. 481, 62 L.Ed.2d 406 and the trial court's failure to grant the prosecution's motion to disqualify the Respondent is not determinative as to whether or not the Respondent breached the rules of professional responsibility.

The Respondent also argues that misconduct under Count II is contingent on a finding of misconduct under Count I and cannot stand alone. Our conclusion today that the Commission failed to prove misconduct under Count I cannot alter the conflict which existed at the time of the representation. Respondent's conduct and the reasonableness of his belief must be judged within the context of the facts existing at the time the conduct occurred. At such time, the prosecution, exercising prosecutorial discretion, had directed its investigation toward the Respondent and was seeking information relative to this issue from Respondent's client in exchange for immunity for Respondent's client. These diametrically opposed interests were in conflict.

In light of the findings and foregoing considerations, this Court concludes that the Respondent engaged in prohibited conflict of interest in violation of Rule 1.7(b) of the *Rules*.

■ Having found misconduct, we must now assess an appropriate sanction. This involves an examination of the nature of the violation, the specific acts of the Respondent, this Court's responsibility to preserve the integrity of the Bar, and the risk to which the public will be subjected if the Respondent is permitted to continue in the profession. *In re Olsen* (1989), Ind., 547 N.E.2d 849; *In re Hampton, supra; In re Morelein, supra.*

The free exercise of independent professional judgment on behalf of a client is the cornerstone of any attorney-client relationship. The subtle pressures inherently present when a lawyer represents conflicting interests erode away the element of trust which must exist in such a relationship. *In re Herbert* (1990), Ind., 553 N.E.2d 130. Unfortunately, the conflict created by Respondent's continued representation of Lisa under the circumstance of this case was hardly subtle. We fully concur with the Hearing Officer's analysis that the Respondent's entirely unreasonable belief that his representation of Lisa would not be adversely affected when Lisa was being offered immunity if he would testify against the Respondent is telling evidence of the risk and poor judgment that can result from the loss of objectivity. Respondent's blatant and persistent flaunting of this duty indicates a serious lack of professional objectivity absolutely essential in the attorney-client relationship.

Upon examination of the nature of the violation involved and the specific acts of the Respondent, we find that a brief period of suspension is warranted under the circumstances of this case. It is, therefore, ordered that the Respondent is suspended from the practice of law for a period of 60 days, beginning July 23, 1990.

In light of this determination, Respondent's Motion for Sanctions is denied. Costs of this proceeding are assessed against the Respondent.